**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **RICHARD OLUWAROTIMI ADEBAYO,** | § § § | |
| **Petitioner,** | § § § | |
| **v.** | § § | **Civil Action No. 4:26-cv-00513-O-BP** |
| **MERCY G. ADEBAYO,** | § § § | |
| **Respondent.** | § | |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**</u>
<u>**OF THE UNITED STATES MAGISTRATE JUDGE**</u>

Petitioner Richard Oluwarotimi Adebayo ("Mr. Adebayo"), proceeding *pro se*, filed this suit on Apil 27, 2026, pursuant to The Convention on the Civil Aspects of International Child Abduction (the "Convention"), Oct. 25, 1980, 1343 U.N.T.S. 89, S. Treaty Doc. No. 99-11 and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. 9001 *et seq*. (2026). ECF No. 1. Mr. Adebayo seeks the return of his three children to Portugal, alleging that Respondent Mercy G. Adebayo ("Mrs. Adebayo") wrongfully retained them in the United States. *Id.* By Order dated May 12, 2026, Chief United States District Judge Reed O'Connor referred the case to the undersigned for pretrial management pursuant to 28 U.S.C. § 636(b)(1)(B). ECF No. 18.

On June 5 and 8, 2026, the Court held an evidentiary hearing and heard testimony from Mr. Adebayo via videoconference from Portugal and in-person testimony from Mrs. Adebayo. Additionally, the undersigned met *in camera* with the two eldest Adebayo children, K.I.A. and K.A.A, who are both subject to this suit. Having reviewed the record in its entirety, heard the testimony of the witnesses and the children interviewees, and duly considered the pleadings, briefing, and arguments of both parties as well as the applicable legal authorities, the undersigned

enters the following proposed findings of fact and conclusions of law and **RECOMMENDS** that Chief Judge O'Connor **DENY** Mr. Adebayo's petition for the return of his children to Portugal. Any finding of fact that may be deemed to constitute a conclusion of law should be so considered and adopted as a conclusion of law. Any conclusion of law that may be deemed to constitute a finding of fact should be so considered and adopted as a finding of fact.

## I.      LEGAL STANDARDS

The Convention is a multilateral treaty that emerged "in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). It "requires that a child wrongfully returned from [his or] her country of habitual residence be returned there upon petition." *England v. England*, 234 F.3d 268, 270 (5th Cir. 2000). The Convention has two chief objectives: (1) "to restore the pre-abduction status quo" and (2) "to deter parents from crossing borders in favor of a more sympathetic court." *Guevara v. Castro*, 155 F.4th 353, 360 (5th Cir. 2024). It "rests on a core principle: 'the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence.'" *Id.* (quoting *Abbott*, 560 U.S. at 20). In this way, the Convention is "not concerned with establishing the person to whom custody of the child will belong at some point in the future. . . . It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004).

As of June 2026, one hundred three countries, including the United States and Portugal, are Convention signatories. *See* Convention of 25 Oct. 1980 on the Civil Aspects of International Child Abduction Status Table, HAGUE CONF. ON PRIV. INT'L L., https://www.hcch.net/en/

instruments/conventions/status-table/?cid=24 (last visited June 12, 2026). In the United States, Congress implemented the Convention's obligations by passing ICARA. 22 U.S.C. § 9001.

To secure the return of a child at issue, ICARA provides that a Convention petitioner must establish by a preponderance of the evidence that the child was wrongfully removed or retained. 22 U.S.C. § 9003(e)(1)(A). This claim involves three elements: (1) the respondent removed or retained the child somewhere other than the child's habitual residence; (2) the removal or retention violated the petitioner's rights of custody under the laws of the habitual-residence nation; and (3) at the time of removal or retention, the petitioner was actually exercising those rights, either jointly or alone, or would have but for the removal or retention. *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012), *abrogated on other grounds by Smith v. Smith*, 976 F.3d 558, 561 (5th Cir. 2020). Such a claim applies only to children younger than sixteen. *Abbott*, 560 U.S. at 9.

Once a petitioner makes a *prima facie* case by a preponderance of the evidence, the burden shifts to the respondent to establish an affirmative defense. 22 U.S.C. § 9003(e)(2). Defenses under the Convention are "narrow." *Sealed Appellant*, 394 F.3d at 343. These include the non-removing party's "consent[] to or subsequent[] acquiescence in the removal or retention," and the "object[ion] to being returned" of a child who has "attained an age and degree of maturity at which it is appropriate to take account of its views," which the respondent must prove by a preponderance of the evidence, as well as if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," which the respondent must prove by clear and convincing evidence. *See* Convention, arts. 12, 13, 20; 22 U.S.C. § 9003(e)(2).

Ultimately, if a court concludes that the respondent wrongfully removed or retained the child at issue, and finds that the respondent did not establish an affirmative defense by the relevant

burden of proof, the child "must be 'promptly returned' to [his or her] country of habitual residence." *Golan v. Saada*, 596 U.S. 666, 672 (2022) (citing 22 U.S.C. § 9001(a)(4)). In the alternative, if a court finds that the petitioner did not carry his burden to establish wrongful removal or retention, the court must deny the petition. *See Smith*, 976 F.3d at 563.

As the Fifth Circuit has recently noted, Convention cases are "not easy, nor [are they] without sorrow." *Guevara*, 155 F.4th at 353. One party invariably will be heartbroken by every outcome. But the Court's task is simply "to determine . . . rights under the Convention." *See* 22 U.S.C. § 9001(b)(4). Whatever merits may exist in an underlying custody case are firmly beyond the Court's purview. *See Sealed Appellant*, 394 F.3d at 344; 22 U.S.C. § 9001(b)(4).

## II.    PROPOSED FINDINGS OF FACT

Mr. and Mrs. Adebayo were married in Newark, New Jersey in February 2012. Together they have three children who are the subjects of this case: K.I.A (born on June 8, 2013), K.A.A (born on November 12, 2014), and K.A.A. (born on August 22, 2017). Each child is under the age of sixteen, was born in New Jersey, and is a United States citizen. They also each are citizens of Nigeria. Mrs. Adebayo is a citizen of Nigeria and the United States. Mr. Adebayo is a citizen of Nigeria.

In 2019, Mr. Adebayo was convicted of various federal offenses. Because he is not a citizen of the United States, he was deported to Nigeria after he served his prison sentence. For a period of time, Mr. Adebayo lived apart from his family who remained in the United States. But in 2021, after Mr. and Mrs. Adebayo jointly decided that the family should live together, Mrs. Adebayo and the three children relocated to Nigeria. The family lived in a three-bedroom apartment in Lagos, Nigeria. Beginning in 2021, the children attended school in Nigeria. They also attended

church there. On more than one occasion, Mr. Adebayo disciplined his children with corporal punishment.

In 2024, Mr. and Mrs. Adebayo began discussing a further relocation of the family. Mr. Adebayo's destination of preference was Portugal. Although the Adebayos did not have family or friends there, Mrs. Adebayo agreed to Portugal. In 2025, Mr. Adebayo relocated to Portugal before his family. While there, Mr. Adebayo worked to set up his software development company under Portuguese law. He also pursued applications for permanent legal residence for himself and his family. This process included obtaining NIF identification numbers for each child, which he did obtain. At some point, Mr. Adebayo also enrolled his children in medical insurance.

In September 2025, Mr. Adebayo purchased one-way plane tickets from Lagos to Libson by way of Paris for his wife and children. In early October 2025, the Adebayo family reunited in Portugal. Upon arrival, the family lived in an Airbnb holiday rental. Within a few weeks, Mr. Adebayo leased a three-bedroom apartment in Lavradio, which is near Lisbon. The family obtained IKEA furniture and kitchen equipment for use in the apartment and moved in. In November 2025, Mr. and Mrs. Adebayo pursued schooling opportunities for the children in Portugal. Although each child was processed for enrollment in the local school system, the Alvaro Velho School Cluster informed Mr. and Mrs. Adebayo that it lacked capacity to accommodate the youngest Adebayo child. Mr. and Mrs. Adebayo preferred the three children to enter the same school at the same time. This was at least in part because the children do not speak Portuguese and did not have friends in Portugal. As a result of Mr. and Mrs. Adebayo's preference, the couple began discussing alternative arrangements to get the children in a school. These discussions crystallized around the children enrolling in a school system in the United States.

Mrs. Adebayo had a friend in Fort Worth who agreed to host her and the children. In December 2025, Mr. Adebayo purchased one-way plane tickets for his wife and children from Lisbon to Dallas-Fort Worth. He did not purchase return tickets. On January 25, 2026, Mr. Adebayo took his family to the airport and Mrs. Adebayo, K.I.A., K.A.A., and K.A.A. departed for Texas. The children started school in the Crowley ISD system in February 2026. In March 2026, Mrs. Adebayo informed Mr. Adebayo that she and the children would not be returning to Portugal.

While in Portugal, the children never attended school. They did not participate in any extracurricular activities. They did not attend church. They did not have any identifiable friends. They did not play with local children. They did not attempt to learn Portuguese. They would occasionally visit the supermarket, walk the neighborhood, eat at restaurants, or accompany their mother on errands. These errands did not include doctor's visits because the children did not have a physician in Portugal. The family went on at least one trip to a Portuguese amusement park, but more typically, the children spent their days playing inside on their iPads and drawing.

In the United States, the children go to school, attend church, and have friends. They continue to enjoy playing on their iPads and drawing. Mr. Adebayo can communicate with them via iPads and does so. He sometimes orders them food via DoorDash. He also has mailed them clothes from Portugal. In Portugal, he continues to maintain medical insurance for the children. He has moved residences and keeps some of the children's belongings in a storage unit. He continues to investigate educational opportunities for the children in Portugal.

After the hearing in this case, the Court held *in camera* interviews of K.I.A. and K.A.A. Both children explained that they are strong students and like their schools in Texas. Both children

objected to returning to Portugal. The Court did not interview the youngest child, who also has the initials K.A.A.

### III.    PROPOSED CONCLUSIONS OF LAW

#### A.    Portugal was not the children's habitual residence.

Under the Convention, a child's habitual residence is "[t]he place where a child is at home, at the time of the removal or retention." *Monasky v. Taglieri*, 589 U.S. 68, 77 (2020). This is "a fact-driven inquiry," that "depends on the specific circumstances of the particular case." *Id.* at 78. It also is one "informed by common sense." *Id.* (quoting *Redmond v. Redmond*, 724 F.3d 729, 744 (7th Cir. 2013)). While courts in the Fifth Circuit historically began their analysis "with the parents' shared intent or settled purpose regarding their child's residence," the correct standard is now instead to examine "the totality of the circumstances." *Smith*, 976 F.3d at 561 n.1 (quoting *Berezowsky v. Ojeda*, 765 F.3d 456, 466 (5th Cir. 2014)); *Monasky*, 589 U.S. at 71.

Accordingly, parental intention is only one of many factors, as is the child's "acclimatization." *Id.*; *id.* at 78 n.3 (enumerating other potential factors). "The bottom line" is that "[t]here are no categorical requirements for establishing a child's habitual residence." *Moreau v. White*, No. 25-40031, 2026 WL 1358743, at *4 (5th Cir. May 15, 2026) (quoting *Monasky*, 589 U.S. at 80). But a child's residence will be "sufficiently enduring when it reflects 'some degree of integration by the child in a social and family environment.'" *Id.* (quoting *Monasky*, 589 U.S. at 76-77). A residence can only be habitual when it is more than transitory. *Monasky*, 589 U.S. at 76.

On the record before it, the Court finds that Portugal was not the children's habitual residence. It is true that the family resided in a three-bedroom apartment in Lavradio, but a life in a given residence does not necessarily show that a child was "at home" there. This is especially so in this case. Although the children maintained certain aspects of an ordinary domestic life in their

Portuguese apartment, they did not regularly leave that apartment. They did not meet people. They did not make friends. They did not have the capacity to make Portuguese friends given how often they stayed indoors and how insurmountable the English-Portuguese language barrier was to them.

The evidence reveals that the children scarcely integrated with Portuguese society. Particularly salient is the fact that the children did not attend school. *See Matter of E.Z.*, No. 1:21-cv-06524-MKV, 2021 WL 5106637, at *21 (S.D.N.Y. Nov. 2, 2021) ("Arranging for the immediate and long-term schooling of children in a new country further supports that the child's habitual residence changed to that new country.") (collecting cases). As a result, K.I.A., K.A.A., and K.A.A. did not form a routine or a day-to-day life that was unique to Portugal and could not be replicated in any international setting. Furthermore, neither Mr. Adebayo nor Mrs. Adebayo testified that the children were involved in any extracurricular activities, formed any meaningful connections to their neighborhood or the local children who lived there, or visited any Portuguese healthcare providers. *See id.* (finding these considerations significant); *Goderth v. Yandall-Goderth*, No. 24-cv-8211, 2025 WL 1866307, at *8 (N.D. Ill. July 7, 2025) (same); *Reid v. Remekie*, No. 25-cv-0904 (RER) (JRC), 2025 WL 1769364, at *13 (E.D.N.Y. June 26, 2025) (same); *Tsuruta v. Tsuruta*, 629 F. Supp. 3d 942, 952 (E.D. Mo. 2022) (same); *Moreau v. White*, No. 4:24-cv-857, 2025 WL 227793, at *8 (E.D. Tex. Jan. 17, 2025) (same), *aff'd in part, vacated in part*, No. 25-40031, 2026 WL 1358743, at *4 (5th Cir. May 15, 2026).

This isolated existence in Portugal stands in sharp contrast to the children's circumstances in Nigeria and in the United States. In Nigeria, they attended church and went to school. In the United States, they attend church, go to school, and have several friends. This shows that they once had and now again have meaningful lives in a more permanent home environment, which they lacked in their approximate three months in the apartment in Portugal.

The Court also notes the remarkably short nature of that stay. To be sure, duration alone is not dispositive. *See, e.g.*, *Tenorio v. Vieira*, No. 25-CV-722-SJB-JMW, 2025 WL 1928543, at *14-17 (E.D.N.Y. July 14, 2025) (finding that a child's four-month stay in Portugal was sufficient to make Portugal the child's habitual residence). But it is significant. *See, e.g.*, *Karkkainen v. Kovalchuk*, 445 F.3d 280, 294 (3d Cir. 2006) ("It is fair to ask whether [the child] was physically present in the [country] for an amount of time sufficient to provide the experiences required to acclimatize to a new country."); *Lee v. Curcio*, No. 25-11835, 2025 WL 2814147, at *2-3 (11th Cir. Oct. 3, 2025) ("Since [the child] was in Brazil for only approximately sixty days, we note at the outset that the burden [to prove habitual residence] is particularly difficult to meet."). Here, within two months of moving to Portugal, Mr. and Mrs. Adebayo began planning for the children and their mother to move to the United States so the children could attend free public school there. When the Court combines the Adebayo children's total stay of three months in Portugal with the sheer lack of opportunity in that abbreviated timeframe to acclimate, the duration of their stay counsels against a finding of habitual residence there.

The Adebayo children's experience was not the experience of the child in *Tenorio*. There, the child "attended school in Portugal; participated in numerous field trips, cultural excursions, and extracurricular activities; spent considerable time with [his parent's] sisters and their children; and developed friendships with his peers and the son of his parents' close family friends." *Tenorio*, 2025 WL 1928543, at *16. In contrast, K.I.A., K.A.A., and K.A.A. experienced nothing of the kind. Outside of Mr. and Mrs. Adebayo, the children did not regularly see or interact with other human beings. Neither Mr. nor Mrs. Adebayo had any family or friends in Portugal. The family was essentially alone in a country whose language it did not speak, and of whose culture it was not a part. *See Nisbet v. Bridger*, No. 3:23-cv-00850-IM, 2023 WL 6998081, at *7 (D. Or. Oct. 24,

2023) (assigning great weight to a lack of family and friend connections in Scotland), *aff'd*, 124 F.4th 577 (9th Cir. 2024), *cert. denied*, 146 S. Ct. 93 (2025).

Nevertheless, the Court credits the abundant evidence that Mr. Adebayo intended Portugal to become the children's habitual residence. He investigated schools, he leased an apartment, he furnished that apartment, he arranged for the children to receive NIF numbers, he worked to register a business, he maintained medical insurance for the children, he planned on helping the children learn Portuguese, and he demonstrated a strong desire to have his family with him under one roof. But despite his intentions, the simple reality is that the children left Portugal before that country could become their habitual residence. Whatever conflicts exist between Mr. Adebayo's and Mrs. Adebayo's testimony about their intentions to establish a family life in Portugal, the evidence overwhelmingly demonstrates that the children were not integrated into any kind of habitual social environment during their three-month stay in the Lisbon suburbs. Though Mrs. Adebayo answered in response to her husband's cross-examination that the children were at home there, the Court interprets this response to mean that the children stayed in a home-type, residential environment with their parents and siblings for their three months in Lavradio, not that they had significant lives outside of their apartment, and not that they developed a habitual residence in Portugal.

Occasional errands, family dinners, and a trip to an amusement park do not distinguish an extended vacation from a life at home. Common sense would suggest that only a set routine and well-developed social connections can do that. *See Monasky*, 589 U.S. at 78 (quoting *Redmond*, 724 F.3d at 744). The Adebayo children lacked both, and the totality of the circumstances in this case demonstrates that the children were never at home in Portugal. Because Mr. Adebayo did not prove by a preponderance of the evidence that Portugal was the children's habitual residence

10

immediately prior to their retention in the United States, he failed to establish his *prima facie* case for wrongful retention, and the Court should therefore **DENY** his petition. *Smith*, 2019 WL 13201172, at *5; *Smith*, 976 F.3d at 563.

### B. Mr. Adebayo proved the balance of his *prima facie* case.

Although the Court concludes that Portugal was not the Adebayo children's habitual residence, it nonetheless examines the rest of Mr. Adebayo's *prima facie* case and finds he did prove the balance by a preponderance of the evidence.

#### 1. Mrs. Adebayo's retention violated Mr. Adebayo's custody rights under Portuguese law.

Mr. Adebayo asserts that under Portuguese law, Mrs. Adebayo lacked unilateral authority to change the children's country of residence without Mr. Adebayo's consent or without a court order. ECF No. 31 at 13 (citing Código Civil, art. 1901-1902, 1906, 1911-1912 (Port.)); *see* Código Civil, art. 1906(1) (Port.) ("*As responsabilidades parentais relativas às questões de particular importância para a vida do filho são exercidas em comum por ambos os progenitores.*" ("Parental responsibilities relating to matters of particular importance to the child's life are exercised jointly by both parents.")). In support, at the hearing Mr. Adebayo offered the affidavit of Portuguese lawyer Eduardo Marculano into evidence. Mr. Marculano declares his opinion that "[u]nder Portuguese legal principles, a change in the child's country of residence is generally regarded as a matter of particular importance and, absent a court order providing otherwise, ordinarily requires the consent of both parents." ECF No. 32 at 350.

Mrs. Adebayo did not dispute Mr. Adebayo's and Mr. Marculano's interpretations of Portuguese law, and she did not present conflicting authority. At most, she objected to admitting the affidavit into evidence because she contended Mr. Adebayo did not properly authenticate a translation of the affidavit from Portuguese to English. However, as the Court explained at the

11

hearing, because she could not identify some basis to question the accuracy of the translation, the Court overruled her evidentiary objection.

Considering Mrs. Adebayo's virtual lack of opposition to Mr. Adebayo's position, and the support the Court draws from Mr. Marculano's affidavit, the Court finds Mr. Adebayo's interpretation of Portuguese law on this point to be sound. If Mrs. Adebayo did not have a court order that permitted her to permanently change the children's residence to the United States, and if Mr. Adebayo did not consent to that change, then Mrs. Adebayo violated Mr. Adebayo's custody rights under Portuguese law by retaining the children in Texas.

Mrs. Adebayo conceded in her testimony that she did not have a court order. And for the reasons explained in Part III.C.1, *infra*, Mr. Adebayo did not consent to Mrs. Adebayo's retention of the children. Accordingly, the Court concludes Mrs. Adebayo violated Mr. Adebayo's custody rights under Portuguese law by retaining the children in Texas without his consent.

### 2. Mr. Adebayo was exercising his custody rights at the time of retention.

"[I]n the absence of a ruling from a court in the child's country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of those rights." *Sealed Appellant*, 394 F.3d at 345. "To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child." *Id.*; *see also Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996) ("[I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Convention short of acts that constitute clear and unequivocal abandonment of the child.").

Mrs. Adebayo does not seriously challenge Mr. Adebayo's exercise of his custody rights. Although from the day the children departed Lisbon, Mr. Adebayo has been physically separated

from them, the evidence clearly demonstrates that he maintained regular virtual contact by communicating with the children through their iPads. He purchased them meals and had food delivered via DoorDash. He continued to maintain health insurance for the children in Portugal. He was exploring educational arrangements in anticipation of their eventual return. It is manifestly clear that Mr. Adebayo did not "abandon" his children. Therefore, the Court concludes that Mr. Adebayo was exercising his custody rights at the time of retention.

### C. Mrs. Adebayo did not establish an affirmative defense.

Although the Court concludes that Portugal was not the Adebayo children's habitual residence, it nonetheless examines the three affirmative defenses under the Convention that Mrs. Adebayo raised in her pleadings. ECF No. 20, 34. The Court finds she did not carry her burden to prove them.

### 1. Mr. Adebayo did not consent to the children remaining in Texas.

"The consent defense involves the petitioner's conduct prior to the contested removal or retention. The focus of inquiry is the petitioner's subjective intent, as evinced by the petitioner's statements or conduct, which can be rather informal." *Hernandez v. Erazo*, No. 23-50281, 2023 WL 3175471, at *3 (5th Cir. May 1, 2023) (cleaned up) (citing, *inter alia*, *Baxter v. Baxter*, 423 F.3d 363, 371 (3d. Cir 2005), *abrogated on other grounds by Smith*, 976 F.3d at 561). "In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account." *Baxter*, 423 F.3d at 371. Critically, "[t]he fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention." *Id.*

Mrs. Adebayo argues that Mr. Adebayo consented to the children permanently relocating to the United States, which she contends the children's one-way plane tickets from Lisbon to Dallas-Fort Worth demonstrate. *See* ECF No. 34 at 15-16. As she tells it, Mr. Adebayo initially consented to permanent relocation, but after a financial dispute with Mrs. Adebayo retracted that consent and filed the present petition. *Id.* She also offered evidence that Mr. Adebayo had designs to return to the United States someday.

Mrs. Adebayo did not prove by a preponderance of the evidence that Mr. Adebayo ever consented to a permanent relocation. While possible that Mr. Adebayo wanted to relocate to the United States himself, there was no evidence that such a dream was anywhere close to reality due to his previous criminal conviction and immigration status. Furthermore, the record makes it highly doubtful that Mr. Adebayo would have consented to his children living an ocean away from him while he indeterminately worked his way through the United States immigration system.

Instead, the evidence showed that Mr. Adebayo had every intention that his family would return to Portugal. As discussed, Mr. Adebayo continued to maintain health insurance for the children in Portugal and was exploring future Portuguese educational arrangements. It is true that he shipped many of the children's clothes to the United States and kept many of their other belongings in a Portuguese storage unit. It also is true that he personally purchased the plane tickets to the United States and saw his family off at the Lisbon airport. But this evidence does not directly conflict with a subjective understanding that his family would eventually return. While the one-way nature of the plane tickets is potentially probative, the Court finds Mr. Adebayo's assertion that he could not be sure of when exactly to schedule the return flights because he did not know when Mrs. Adebayo could renew the children's passports once she arrived in the United States to be credible.

### 2.    Mr. Adebayo does not present a grave risk to the children.

To prove the grave risk defense, Mrs. Adebayo had to show that "that the risk to the [children] is grave, not merely serious." *Galaviz v. Reyes*, 95 F.4th 246, 256 (5th Cir. 2024). "[G]rave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize. [And] [t]he alleged harm must be a great deal more than minimal and greater than would normally be expected on taking a child away from one parent and passing him to another." *Id.* at 256-57 (cleaned up). "[F]indings of grave risk are rare." *Delgado v. Osuna*, No. 4:15-cv-00360-CAN, 2015 WL 5095231 (E.D. Tex. Aug. 28, 2015), *aff'd*, 837 F.3d 571 (5th Cir. 2016). This is in part because "grave risk must be narrowly construed; otherwise, a broad interpretation would cause the exception to swallow the rule and transform the Convention into an arena for custody disputes." *Soto v. Contreras*, 880 F.3d 706, 710-11 (5th Cir. 2018) (quoting *Tavarez v. Jarrett*, 252 F. Supp. 3d 629, 640 (S.D. Tex. 2017)).

It is also in part because the clear and convincing burden "establishes a strong presumption favoring return of a wrongfully removed child." *Id.* at 711. Clear and convincing evidence is "evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts." *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992). Mrs. Adebayo's evidence falls far short of this hurdle. She presented testimony that Mr. Adebayo has used corporal punishment on the children, smoked marijuana in their home, and was at various times a distant father. Even so, the "grave risk" defense "focuses on the risk of harm posed by the child's repatriation. It is not an invitation to determine whether custody with one parent would be in the best interest of the child." *Galaviz*, 95 F.4th at 257. As such, the critical "question is whether there is clear and convincing evidence that return would expose the child to

a grave risk of harm, not whether a parent is a worthy custodian." *Id.* Mrs. Adebayo's evidence and arguments did not meet the standard required to show a grave risk of harm to the children.

While the Court finds Mrs. Adebayo's testimony that Mr. Adebayo employs corporal punishment credible, the limited evidence she presented of a risk of potential harm falls far short of a grave risk. She testified that Mr. Adebayo used a stick and a cord to discipline the children, and Mr. Adebayo conceded in his own testimony that he has placed his hands on his children to discipline them. But this behavior is not the kind contemplated by the grave risk defense. "Sporadic or isolated incidents of physical discipline directed at the child . . . have not been found to constitute a grave risk under the clear and convincing burden." *Galaviz*, 95 F.4th at 260 (cleaned up) (quoting *Souratgar v. Lee*, 720 F.3d 96, 104 (2d Cir. 2013)); *see also Saldivar v. Rodela*, 879 F. Supp. 2d 610, 630 (W.D. Tex. 2012) (corporal punishment of a child with a stick did not meet grave risk burden). In contrast, in *Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007), the Sixth Circuit found that the respondent met her burden because the evidence demonstrated physical abuse of the children that included "repeated beatings, hair pulling, ear pulling, and belt-whipping" that occurred at such an "extreme frequency" that the children developed post-traumatic stress disorder. *Simcox*, 511 F.3d at 608-609. The evidence in this case did not rise to that level of physical punishment or abuse of a child.

Mrs. Adebayo also testified that Mr. Adebayo levied physical and verbal abuse towards her while the family was in Nigeria. In particular, she testified that he once hit her so hard she lost consciousness and had to be revived by a splash of water. Mr. Adebayo emphatically denied these allegations. When cross-examined by Mr. Adebayo about why she never mentioned such conduct in their numerous WhatsApp text exchanges arguing back and forth, Mrs. Adebayo testified that she had, but Mr. Adebayo deleted the messages. The Court does not find this testimony credible.

It is unclear when Mrs. Adebayo says she sent such messages, but to the extent she means she did so after January 2026, it is difficult to understand how Mr. Adebayo could have deleted the messages off her phone from his location in Portugal.

Even if the Court accepts all of Mrs. Adebayo's evidence of Mr. Adebayo's abusive behavior, there was scarce evidence that it was widely prolific. Nor was there much evidence that the occasions of abuse were profound outside of the incident in which she lost consciousness. Nor, more importantly, was there evidence that such behavior was directed at the children or placed them at a grave risk of physical or psychological harm if they returned to Portugal. *See Madrigal v. Tellez*, 848 F.3d 669, 677 (5th Cir. 2017) (collecting cases concerning spousal abuse in the grave risk context); *Galaviz*, 95 F.4th at 260. Mr. Adebayo conceded in his testimony that the children undoubtedly witnessed his and his wife's arguments in the past. But even if those arguments were serious, Mrs. Adebayo did not meet her burden to demonstrate by clear and convincing evidence that such arguments—however they escalated—pose a continuing grave risk of harm to her children.

### 3.    The objections of K.I.A. and K.A.A. are not controlling.

"The Convention establishes that a court 'may refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.'" *Rodriguez v. Yanez*, 817 F.3d 466, 473 (5th Cir. 2016) (quoting *England*, 234 F.3d at 272). But it "does not set an age at which a child is automatically considered to be sufficiently mature." *Vasconcelos v. Batista*, 512 F. App'x 403, 405 (5th Cir. 2013) (quoting *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007)). "[R]ather[,] the determination is to be made on a case-by-case basis." *Smith v. Smith*, No. 4:19-cv-784-O, 2019 WL 13201172, at *3 (N.D. Tex. Nov. 20, 2019), *aff'd*, 976 F.3d 558 (5th Cir. 2020).

17

Importantly, however, the Convention *does* require an objection, "not a mere preference." *Rodriguez*, 817 F.3d at 476. "There is a substantive difference between preferring to live in one of two countries—when living in either country would be acceptable—and affirmatively objecting to returning to one country—when living in that country would be unacceptable." *Id.* at 477.

After conducting its *in camera* interviews of K.I.A. and K.A.A., the Court found both girls to be mature, articulate, and self-aware. They expressed themselves well and demonstrated that they are strong students. Both children objected to returning to Portugal, corroborating testimony heard throughout the hearing that they lacked friends in that country, did not do much while living there, constantly stayed inside, and found life difficult because they do not speak Portuguese.

But the Court perceived their testimony to bear certain indicia of influence. Their responses precisely echoed much of Mrs. Adebayo's testimony and many of the statements in her pleadings, and their manner of speaking bore certain signs of rehearsal. For this reason, the Court finds that their objections are not free of influence and should not be given controlling weight. *Dietz v. Dietz*, 349 F. App'x 930, 934-35 (5th Cir. 2009). Consequently, Mrs. Adebayo did not prove her final defense by a preponderance of the evidence.

## IV.    RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Chief Judge O'Connor **DENY** Mr. Adebayo's petition for the return of his children to Portugal.

A copy of these findings, conclusions, and recommendation shall be served by all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b)(1). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis

for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).

    **SIGNED** on June 12, 2026.

                                            _____
                                            Hal R. Ray, Jr.
                                            UNITED STATES MAGISTRATE JUDGE